RECEIVED

JAN 18 2023

AT 8:30_____ M
WILLIAM T. WALSH
CLERK

2022R000568/RR

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Shipp |
| v. | : | Criminal No. 23-40 (MAS) |
| RALPH B. ANDERSON | : | 18 U.S.C. § 371 |

# INFORMATION

The defendant having waived in open court prosecution by indictment, the United States Attorney for the District of New Jersey charges:

**Introductory Paragraphs**

1. Beginning at least as early as 2013, and continuing through at least December 2019, in the District of New Jersey and elsewhere, the defendant, RALPH ANDERSON ("ANDERSON"), Jack Fisher, James Sinnott, Kate Joy, and others known and unknown to the United States Attorney, knowingly participated in a scheme to defraud the IRS by organizing, marketing, implementing, and selling tax shelters in the form of fraudulent syndicated conservation easements ("SCEs"), and by using means and methods intended to deceive the IRS about the legitimacy of those transactions and about the circumstances under which the fraudulent tax shelters were marketed and implemented.

2. ANDERSON and his conspirators organized, marketed, and implemented the fraudulent SCEs for high-income clients through false and fraudulent means, including preparing and causing to be prepared, and filing and causing to be filed by the clients with the IRS, false and fraudulent U.S.

individual income tax returns reporting fraudulent tax deductions from the SCE tax shelters, which resulted in the payment of far lower taxes by the clients. By selling tax deductions to clients through the SCE tax shelters, ANDERSON and his conspirators enriched themselves personally through the generation of fee and commission income. ANDERSON and his conspirators also utilized the SCE tax shelters to evade their own taxes on the substantial income received, at least in part, through the sale of the fraudulent SCE tax shelters.

### The Defendant and Associated Entities

3.    ANDERSON was a certified public accountant since at least 1983 through the present who worked at various accounting firms in New Jersey and New York until in or around 2018. In 2016, ANDERSON began working full time for his own business, Company-1, a tax and financial services consulting firm with offices in New Jersey, New York, and Florida.

4.    Accounting Firm 1 was an accounting, tax, consulting, and advisory firm located in Woodbridge, New Jersey. From in or around 2012 through in or around September 2015, ANDERSON worked as a partner at Accounting Firm 1.

5.    Accounting Firm 2 was an international advisory and accounting firm with more than 20 office locations. From in or around 2015 through from in or around 2018, ANDERSON worked as a CPA at the New York, New York office of Accounting Firm 2.

6.     While working at Accounting Firms 1 and 2, ANDERSON provided accounting and tax planning services to clients of the firms. ANDERSON, along with other conspirators, sold the SCE tax shelters to clients of both firms.

7.     Jack Fisher, a conspirator, charged elsewhere, was a resident of Alpharetta, Georgia. Fisher was a CPA and partner at an Atlanta-area accounting firm when, in or around 2002, he left to run his own business. Shortly thereafter, Fisher began organizing, marketing, promoting, and selling illegal tax shelters. These illegal tax shelters facilitated high-income taxpayers in claiming unwarranted and inflated charitable contribution tax deductions in connection with the donation of a conservation easement over land (the "SCE Tax Shelters" or "Tax Shelters"). Fisher, along with other conspirators, including ANDERSON, promoted and sold the SCE Tax Shelters through Company 1.

8.     James Sinnott, a conspirator, charged elsewhere, was a licensed attorney who partnered with Fisher to organize, market, promote, and sell the SCE Tax Shelters since at least 2013. Sinnott's work at Company 1 and other related entities primarily consisted of management and operations.

9.     Kate Joy, a conspirator, charged elsewhere, worked with Fisher and Company 1 as a Senior Investor/Advisor Relations since at least 2012. Joy assisted Fisher with the organization, marketing, promotion, and sale of the SCE Tax Shelters. Joy served as a primary point of contact for various CPAs and financial advisors (the "Co-promoters") that sold the Tax Shelters to clients.

### The Syndicated Conversation Easement Tax Fraud Scheme

*General Overview of Fraud
in the Design, Marketing, and Implementation of the SCE Tax Shelters*

10. From at least 2013 through 2020, Fisher, Joy, Sinnott, and other conspirators, through Company 1, organized, promoted, and sold at least 15 SCE Tax Shelters. ANDERSON and other Co-promoters promoted and sold units in the various Tax Shelters to their clients (hereinafter "Participants"), and in exchange, the Participants received a tax deduction. In reality, the SCE Tax Shelters were illegal tax shelters that allowed taxpayers to buy tax deductions at the end of a tax year—and sometimes after the tax year ended—to illegally shelter their income from taxes for that year.

11. ANDERSON first learned about the SCE Tax Shelters from Accountant 1, a conspirator, who also worked at Accounting Firm 1.

12. The design, organization, marketing, promotion, and sale of the SCE Tax Shelter transactions were carried out by the conspirators in a similar manner:

   a. Fisher, with the assistance of various conspirators, identified vacant land typically owned for at least one year by an existing entity (a "Property Company.")

   b. Fisher and other conspirators created a separate entity for the SCE Tax Shelter, usually in the form of an LLC, to buy a significant interest in the Property Company instead of purchasing the land directly from the Property Company.

   c. Fisher, Sinnott, Joy, and other conspirators, directly and through various Co-promoters, including ANDERSON, promoted, marketed, and sold the SCE Tax Shelters to the Participants: high income taxpayers. To become a

member in the SCE Tax Shelter, each Participant was required to complete and sign a subscription agreement and purchase units in the Tax Shelter that were typically offered for $25,000 per unit.  Fisher, Sinnott, Joy, and other conspirators structured the Tax Shelter to guarantee at least a 4:1 tax deduction ratio for each Participant, which meant that for every unit a Participant purchased in the Tax Shelter, the Participant could expect to receive a charitable tax deduction totaling at least four times the amount the Participant paid for the units.

  d. Using the typical 4:1 ratio, for every $100,000 of units purchased by a Participant, the Participant received a non-cash charitable contribution tax deduction of approximately $400,000 that he or she then claimed on their income tax return.  For high-income Participants who fell within the highest tax bracket of approximately 40%, a $100,000 purchase of units using the standard 4:1 tax ratio returned $160,000 to the Participant.

  e. At the end of each calendar year, which was also the end of the tax year for the Participants, the conspirators typically requested the Participants to vote on options for the land: (1) a "development option;" (2) a "green" or charitable donation option involving placement of a portion of the land into a conservation easement or donating the land in fee simple to a charitable organization; or (3) a "buy and hold plan." Because the SCE Tax Shelters were marketed and sold as a tax deal, the "vote" was a forgone conclusion and every SCE Tax Shelter promoted by Fisher, Sinnott, Joy, ANDERSON, and the other Co-promoters for the 2013 through 2019 tax years delivered the fraudulent tax deductions

5

necessary to achieve the promised ratio to the Participants. As a result, ANDERSON routinely advised clients that they could guarantee a tax deduction from buying units in the SCE Tax Shelters.

    f. After the purported "vote," the conspirators caused the Property Company to either (1) place a conservation easement over a portion of the land and then donate the conservation easement to a land conservancy, or (2) donate the land in fee simple to a charitable organization.

    g. The Tax Shelters held a portion of the land unencumbered by the conservation easement (the "residual property") in an effort to make it appear that the Tax Shelters had economic substance. Instead, the residual property was nothing more than window-dressing that Fisher and Company 1 claimed might be developed or sold. In reality, they did not develop or sell the residual property or distribute income to Participants with respect to a development or sale of the residual property.

    h. Fisher, Sinnott, and their conspirators obtained appraisals that valued the conservation easement or fee simple donations at the inflated amounts Fisher, Joy, Sinnott, and their conspirators needed to deliver the promised tax deduction ratio to potential Participants.

    i. These inflated values were used to generate non-cash charitable contribution tax deductions on the Property Companies' federal tax returns. These tax returns then allocated a non-cash charitable contribution tax deduction that passed the deductions through to the Tax Shelter's Participants on a Schedule K-1. The Participant would then report that flow-through

6

charitable contribution deduction on his or her individual income tax return as a tax deduction, substantially reducing his or her tax liability.

13.    Because of his tax training and experience, ANDERSON knew the SCE Tax Shelters were too good to be true when he originally learned of the transactions in 2013.

14.    Because of his tax training and experience and because of independent research he conducted into SCEs, ANDERSON knew that the SCE Tax Shelters must have a business purpose or economic substance, or else they would be disregarded under federal tax law.

### Preparation of False and Fraudulent Income Tax Returns

15.    ANDERSON willfully prepared or caused to be prepared false and fraudulent individual income tax returns for SCE Tax Shelter Participants that included the fraudulent tax deductions generated by the SCE transactions.  For many of these Participants' tax returns, ANDERSON also knew that the Participants had purchased units in the SCE Tax Shelters after the close of the tax year and that the Participants, therefore, would not be entitled to take a charitable tax deduction related to the SCE Tax Shelters, even if the tax shelter was otherwise legitimate—which it was not.

### Tax Loss Caused by the Fraudulent Tax Shelters

16.    Because the SCE Tax Shelters were planned, structured, and executed for the sole purpose of generating huge tax deductions for Participants (and therefore lacked any other economic substance and business purpose), they

resulted in a massive evasion of taxes, facilitated by ANDERSON, and other named and unnamed conspirators on behalf of the Tax Shelter Participants.

### Financial Benefits to ANDERSON

17. The individuals who promoted this scheme earned money for their efforts. In return for selling units to clients, Fisher and his entities paid Accounting Firm 1 or Company-1 a commission of 12% of the money his clients paid for their units.

18. ANDERSON began receiving commissions, directly and indirectly, from Fisher for promoting the SCE Tax Shelters to tax clients in or around 2014. In total, for the years 2016 through 2019, ANDERSON received more than $300,000 in commissions.

19. From time to time, Fisher also gave ANDERSON and other partners at Accounting Firm 1, through another entity ("LLC-1"), free units in the SCE Tax Shelters as additional compensation. These units in the SCE Tax Shelters were used to offset income earned by Accounting Firm 1, and the deduction flowed-through to ANDERSON's individual income tax return, as well as to the other members of LLC-1. The units were not reported as income on LLC-1's partnership returns despite the fact that neither ANDERSON, the other partners, nor LLC-1 paid for the units.

### Charging Paragraph

**COUNT ONE**
**Conspiracy to Defraud the United States**
**18 U.S.C. § 371**

8

20. Count One incorporates the allegations set forth in paragraphs One through 21 of this Bill of Information by reference.

21. Beginning as early as 2013 and continuing through at least December 2019, in the District of New Jersey and elsewhere, the defendant,

**RALPH ANDERSON**

did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree with other individuals both known and unknown to the United States Attorney to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Department of Treasury in the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

### Object of the Conspiracy

22. It was a part and object of the conspiracy that, from at least 2013 until in or about December 2019, the defendant, RALPH ANDERSON, and others known and unknown to the United States Attorney, impede, impair, defeat, and obstruct the lawful governmental functions of the IRS in the ascertainment, assessment, and collection of income taxes through the design, marketing, and implementation of fraudulent tax shelter transactions in the form of SCE donations.

### Manner and Means

23. Among the manner and means by which Fisher, Sinnott, Joy, ANDERSON, other conspirators, and other individuals known and unknown to

the United States Attorney, carried out the object of the conspiracy in the following ways:

 a. they designed, marketed, and implemented the SCE Tax Shelters in ways that impeded and obstructed the ability of the IRS to detect the fraudulent nature of the transactions;

 b. they provided the tax savings ratio to prospective Participants before the appraisers hired by Fisher had appraised the value of the easement;

 c. they caused the appraisers to falsely inflate their appraisals of easements in order to achieve the desired amount of tax deductions for the Participants;

 d. they designed, marketed, and implemented the SCE Tax Shelters to disguise the fact that the SCE Tax Shelters were tax-motivated and lacked any economic substance or non-tax business purpose;

 e. they prepared and assisted in preparing, and caused to be prepared, false and fraudulent documents to deceive the IRS, including but not limited to, backdated subscription agreements and checks;

 f. they prepared and caused to be prepared tax returns for the Participants that were false and fraudulent because, among other things, they claimed fraudulent tax deductions related to the SCE transactions, and thereby substantially understated the tax due and owing by the Participants; and

 g. they paid, caused to be paid, and received referral fees and commissions, which frequently were not disclosed to the Participants, as a

means of compensating those who marketed the SCE scheme and to provide incentives to others to do so.

**Overt Acts**

24. To accomplish the objects of the conspiracy, ANDERSON and his conspirators, and others known and unknown to the United States Attorney, committed and caused to be committed the following overt acts, among others, in the District of New Jersey and elsewhere:

a. From at least 2013 through 2018, ANDERSON promoted and sold units in the SCE Tax Shelters to high-income Participants. During each of those years, ANDERSON sold units in the SCE Tax Shelters to Participants after the close of the tax year during which the donation had been made.

b. In an email dated July 30, 2013, ANDERSON asked to discuss the SCE Tax Shelters with the managing partners of Accounting Firm 1: "Can we discuss this as I have been working on this with Jack Fisher.  I feel it is a great shelter and we can make a lot of money on this."

c. On or about March 6, 2014, ANDERSON sent an email to his colleagues at Accounting Firm 1 and explained that they "will receive cash and tax benefits due to our relationship with Jack [Fisher] in the amount of 338,000 (158,000 + 180,000) plus an additional 35,000 in commissions once they are received."  The $180,000 figure was based on receiving free units in SCE Tax Shelters that would "generate losses of 450,000 against AGI."  In other words, using the top tax rate of 40%, ANDERSON estimated that the free units that generated deductions of $450,000 would put $180,000 back in their pocket.

11

d. On or about April 3, 2014, Joy provided ANDERSON with a subscription agreement for LLC-1— the entity Accounting Firm 1 used to receive free units—to sign for units in a Tax Shelter for the prior year, 2013, explaining, "Dear Ralph, Please find enclosed subscription agreement for your 4 units in [a 2013 SCE Tax Shelter], as well as counter page of operating agreement executed by Jack Fisher, the Manager of the Fund." Joy directed ANDERSON to "execute the copies, keep one for your records and send one back to us." The attached subscription agreement was pre-filled and backdated to December 30, 2013.

e. In September 2014, Fisher sent by FedEx subscription agreements and other documents for a 2013 Tax Shelter to ANDERSON, instructing ANDERSON to have his client sign and return the Tax Shelter documents. The documents were pre-filled and backdated to December 31, 2013. Fisher further informed ANDERSON that he would send the client's Schedule K-1 reporting the deduction once Fisher received payment for the units.

f. On or about February 13, 2015, ANDERSON provided his client with subscription documents related to the purchase of $250,000 of units in two Tax Shelters for the prior year, 2014. ANDERSON asked the client to initial and sign the forms and return them to ANDERSON. On or about August 27, 2015, ANDERSON followed up with the client explaining that Company 1 was "all over if payment of the 250,000 will be made by 8/31."

g. During a recorded call on or about March 20, 2015, with a cooperating witness, Fisher admitted giving units to the partners at Accounting

Firm 1, including ANDERSON, to reward them for their willingness to improperly backdate documents and sell units after the close of the year:

> I've cut it back significantly from what I used to do. It's like Ralph and them. You know they got a hundred last year and only got 50 this year. You know, I'm getting rid of that [friends and family units] because it used to be I couldn't sell these things out…
>
> Ralph [ANDERSON] and them, the reason I gave them in friends and family is, I mean, they participated in basically backdating all the documents.

  h. In an email to a client dated August 13, 2015, ANDERSON reached out to secure payment for the client's units in a Tax Shelter for the prior year, 2014, stating: "[Company 1] wants to file their tax returns. They are pushing me for a payment from you. If you cannot make the full 250,000 now let me know what you can make and then please tell me when you can pay the balance and I will do my best to work it out. Keep in mind the 250,000 saves you over 500,000 in taxes."

  i. In an email dated December 27, 2016, in response to a request from Joy for ANDERSON's vote for a SCE Tax Shelter in which he personally purchased units, ANDERSON responded: "I will allow you and Jack to select my vote. I want the most favorable for our investment." The Tax Shelter that ANDERSON invested in for 2016 then recorded a vote for ANDERSON for the development option even though ANDERSON only wanted—and Fisher and Joy should have known ANDERSON only wanted—the tax benefits from the "green option." ANDERSON did not want the SCE Tax Shelter to develop the property.

j. In an email dated January 14, 2016, from ANDERSON to Fisher, ANDERSON informed Fisher that he had just spoken to a client and the client had decided to purchase five units in a SCE Tax Shelter for the prior year, 2015:

> Hi Jack: I just got off the phone with [a client]. [Client] confirmed that he will be investing 125,000 into [a 2015 Tax Shelter]. As [Client] did last year he will be making the investment in 3 payments. [Client] is sending you the executed documents plus his first payment today.

k. On or about February 12, 2016, Fisher sent an email to ANDERSON, requesting that his clients pay for their units in the Tax Shelters for the prior year, 2015: "I do have some Fund obligations coming up in March and need to be sure we get the monies collected." When ANDERSON failed to send the money, Fisher followed up by email dated February 18, 2016: "I hate to keep bugging you but I have business issues to deal with. Can you provide me with dates you know you can make work for the accounts receivable from your clients? . . . We turned away a good bit of money at year end to make room for your clients. I'm going to get a lot of heat as to why we have amounts still owed."

l. On or about February 19, 2016, Joy followed up with ANDERSON, instructing him that one of his clients needed to send both a subscription agreement and check for the purchase of his units in a Tax Shelter for the prior year, 2015.

m. On or about July 27, 2016, ANDERSON emailed Fisher and Joy and informed them that he was meeting with a client to promote the 2016 offering, and asked: "Can I assume the same 4.5:1 write off as in the previous years?"

14

Fisher responded, "Our internal projections indicate that the deductions will be similar to prior years which is generally around 4.5 to 1."

n. On or about September 28, 2016, Joy sent an email to Fisher and other conspirators with the subject line, "A Highly-Successful Income Tax-Advantaged Investment strategy," that provided edits to ANDERSON's proposed sales pitch email to send to his colleague's potential clients. In that email, Joy asked Fisher and other conspirators to review the sales pitch. Joy edited the sales pitch email to describe how the "investor" would get a tax deduction if the Green Option were selected and stated that a "sample of calculations of historic returns" was attached. The following day, on or about September 29, 2016, Fisher forwarded Joy's edits to ANDERSON, copying Joy and ANDERSON, and cautioned ANDERSON not to guarantee the deduction to clients in writing: "We do not like to project future tax benefits but would rather reference historical results. You will need to verbally discuss with your clients the expected tax deduction which will be consistent with prior year results."

o. In January 2017, ANDERSON met with clients at the New York, New York office of Accounting Firm 2 and pitched them on participating in a SCE Tax Shelter for the prior year, 2016. After the meeting, ANDERSON followed up with an email dated January 16, 2017, to the clients, stating:

> It was great seeing you today. It was a great meeting. I have attached the documents you need to sign do [sic] enter the conservation easement. Please sign and I will complete the rest. You will receive a 4.5 to 1 write off. Let me know if you have any questions.

15

The attached documents, which included a subscription agreement, were pre-filled and backdated to December 29, 2016.

p. On January 28, 2019, ANDERSON sent an email to Fisher requesting that the number of units he and his wife had purchased in a 2018 SCE Tax Shelter be reduced and their money refunded. ANDERSON explained, "[ANDERSON'S wife] fine tuned our 2018 tax projection today. As it turns out we only require a 175,000 investment. So, if you have someone who could take another 25,000 and refund [ANDERSON's wife] 25,000 we would appreciate that. Please let me know." Several months later, in April 2019, Joy sent an email to ANDERSON's wife and copied several other individuals, including Fisher, confirming that ICM had refunded ANDERSON's wife the $25,000 as ANDERSON had requested.

All in violation of Title 18, United States Code, Section 371.

_____
Philip R. Sellinger
United States Attorney
District of New Jersey